UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

NATIONAL UROLOGICAL GROUP,
INC., et al.,

    Defendants.

CIVIL ACTION NO.

1:04-CV-3294-CAP

## O R D E R

This matter is before the court on the Federal Trade Commission's (FTC) motion for contempt judgment and imposition of compensatory and coercive sanctions [Doc. No. 446] and Hi-Tech Pharmaceuticals, Inc.'s (Hi-Tech) motions for leave to file a sur-reply [Doc. No. 487], to exclude certain of the FTC's papers from consideration [Doc. No. 488] and to supplement its response in opposition to the FTC's motion [Doc. No. 494].

As an initial matter, Hi-Tech's motion for leave to file a sur-reply is GRANTED, but its motion to exclude certain reply papers from consideration is DENIED. The FTC was justified in including some additional material in its reply, and the defendant had a chance to respond to the evidence and argument in its sur-reply. The court has allowed *both* sides some leeway here. Having given Hi-Tech the opportunity to respond, the court therefore

declines to grant Hi-Tech's request to exclude certain portions of the FTC's reply. Additionally, the court DENIES Hi-Tech's motion for leave to supplement the record because the study it seeks to introduce is irrelevant. The study was published after the alleged contumacious conduct, so it could not have been used or relied upon to substantiate any claims at issue in these contempt proceedings.

## I.    Introduction

In 2004, the FTC filed this action against several defendants alleging they violated Sections 5 and 12 of the FTC Act, 15 U.S.C. §§ 45(a) and 52, by making false and unsubstantiated claims in connection with their advertising and sale of various dietary supplements. On June 4, 2008, the court granted the FTC's motion for summary judgment. *See FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009), *cert. denied*, 131 S. Ct. 505 (2010). On December 16, 2008, the court entered final judgment and permanent injunction orders against the defendants, enjoining them from several activities related to their previous violations of the FTC Act [Doc. Nos. 229, 230] (hereinafter "the Wright Order" and "the Hi-Tech Order").

Section II of each of the injunction orders prohibits the defendants from advertising weight-loss products using claims that the products cause rapid

or substantial weight- and fat-loss or claims that the products affect metabolism, appetite, or fat, unless those claims are substantiated with "competent and reliable scientific evidence." Section VII of the Hi-Tech Order also prohibits defendants Hi-Tech, Wheat, and Smith from making claims concerning the comparative efficacy or benefits of weight-loss supplements that are not substantiated with "competent and reliable scientific evidence." Finally, Section VI of the Hi-Tech Order requires Hi-Tech, Wheat, and Smith to include a specific health-risk warning on any advertisement, product package, or product label that make efficacy claims relating to yohimbine-containing products.

On November 1, 2011, the FTC moved for an order from the court directing defendants Hi-Tech, Jared Wheat, and Stephen Smith to show cause why they should not be held in contempt of the permanent injunction [Doc. No. 332]. Essentially, the FTC contends the defendants have made revised statements about four Hi-Tech products that are not substantiated by competent or reliable scientific evidence, where such evidence was required by the permanent injunction. On March 21, 2012, the FTC moved for a similar order against defendant Terrill Mark Wright, M.D. based on his endorsements of one product, Fastin [Doc. No. 377]. On May 11, 2012, the court granted both motions and scheduled a status conference to address

3

scheduling and discovery [Doc. No. 390] (hereinafter "the May 11 Order"). After the status conference on May 31, 2012, the court ordered the four defendants above to show cause why they should not be held in contempt for failing to comply with the requirements of the final judgment and permanent injunction against them [Doc. No. 399] (hereinafter "the May 31 Show Cause Order").

The May 11 Order addressed several issues that have shaped—and narrowed the scope of—the contempt proceedings thus far. First, the court rejected the defendants' initial argument that their advertisements were puffery.[1] Most importantly, the court agreed with the FTC's contention that the fact question of what constitutes "competent and reliable scientific evidence" to substantiate the subject claims was not open to re-litigation. *See* May 11 Order at 7–10 [Doc. No. 390]. On August 7, 2012, the court clarified the basis for this conclusion in its order denying the defendants' motion for reconsideration [Doc. No. 422, at 13–17] (hereinafter "the August 7 Order"). Third, the court held that the defendants' good faith was irrelevant to the question of whether they were in contempt of the injunction, although their "good faith or substantial compliance *may* be relevant to what sanction, if

_____

[1] The court noted it was not "persuaded by the single paragraph" the defendants used to make the argument, hinting that it would consider more developed arguments at a later date. *See* May 11 Order at 6–7 [Doc. No. 390].

any, should ultimately be imposed." May 11 Order at 10–11 [Doc. No. 390] (emphasis added).

Finally, the May 11 Order and the May 31 Show Cause Order collectively set out the procedure the court would follow to resolve the questions of the defendants' alleged contempt. The court (1) required the FTC to file a specific list of factual allegations and the defendants to admit or deny those allegations (akin to a complaint and answer), (2) permitted limited discovery on relevant issues, and (3) contemplated a "pre-hearing motion" to determine whether there are disputed questions of material fact regarding the defendants' alleged contempt. *See* May 11 Order at 13–14 [Doc. No. 390]; May 31 Show Cause Order [Doc. No. 399]. The procedure set forth by the court is supported by Eleventh Circuit case law. *See Mercer v. Mitchell*, 908 F.2d 763 (11th Cir. 1990); *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding Corp.*, 140 F. App'x 860, 864–65 (11th Cir. 2005) (discussing the "flexible" due process requirements for civil contempt proceedings). The court prescribed this procedure because it anticipated there would be a limited number of facts in dispute and the scope of any eventual contempt hearing could be significantly narrowed by addressing legal questions based on written briefs. Thus, the defendants have had notice and a full opportunity to be heard on the question of their contempt. *See FTC. v. Leshin*,

5

No. 12-12811, 2013 WL 2420363, at *6, ___ F.3d ___ (11th Cir. June 5, 2013) ("It is by now well-settled law that due process is satisfied when a civil contempt defendant receives notice and an opportunity to be heard . . . .").

The contempt proceedings proceeded essentially as prescribed. The FTC filed its complaint-like allegations [Doc. No. 394, at 2–17]. The defendants answered. *See* [Doc. No. 405] (Hi-Tech and Wheat's response); [Doc. No. 406] (Dr. Wright's response); [Doc. No. 467] (Smith's adoption of Hi-Tech and Wheat's response as his own).[2] The FTC filed the present motion for (summary) contempt judgment on October 22, 2012 [Doc. No. 446]. The defendants responded: admitting or denying (though mostly admitting) the FTC's supposedly undisputed material facts, adding their own additional material facts, and arguing why summary contempt judgment should not be granted. *See* [Doc. Nos. 475, 479, 480, 482]. The FTC replied [Doc. Nos. 485, 486], and the court has now allowed Wheat and Hi-Tech's sur-reply [Doc. No. 487-2]. Thus, the FTC's motion for contempt judgment is now ready for the court's consideration.

---

[2] The court allowed Smith's "adoption" of his co-defendants' response "as if timely made" in its December 11, 2012 order [Doc. No. 470, at 3].

## II.    Legal Standards

"An injunction can be enforced, if necessary, through a contempt

proceeding." *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir.

2002).

> A finding of civil contempt must be supported by clear and
> convincing evidence that "the allegedly violated order was valid
> and lawful; . . . the order was clear and unambiguous; and
> the . . . alleged violator had the ability to comply with the order."
> *Riccard*, 307 F.3d at 1296. "Once this prima facie showing of a
> violation is made, the burden then shifts to the alleged contemnor
> to produce evidence explaining his noncompliance at a 'show
> cause' hearing." *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir.
> 1998)

*FTC. v. Leshin*, 618 F.3d 1221, 1232 (11th Cir. 2010).[3] Should the alleged

contemnor meet his burden of production on his inability to comply, the

burden then shifts back to the initiating party to show by clear and

convincing evidence that the alleged contemnor was, in fact, able to comply

with the court's order. *Commodity Futures Trading Comm'n v. Wellington*

*Precious Metals, Inc.*, 950 F.2d 1525, 1529.

---

[3] Although *Leshin* refers to producing evidence of noncompliance at a "show
cause" hearing, this court has already held that due process does not require
a hearing where there are no disputed issues of material fact. May 11 Order
at 4–5 [Doc. No. 390] (citing *Mercer v. Mitchell*, 908 F.2d 763 (11th Cir. 1990);
*Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding Corp.*, 140 F.
App'x 860, 864–65 (11th Cir. 2005)). The defendants have asserted that they
have a "constitutional right to an evidentiary hearing," *see, e.g.*, [Doc. No.
475, at 22] (also citing *Mercer*), but the court has already rejected this
contention.

Although the Eleventh Circuit has described civil contempt in passing as the "willful disregard of the authority of the court," *Riccard*, 307 F.3d at 1296, "[t]he Supreme Court has made clear that the absence of willfulness is not a defense to a charge of civil contempt," *Leshin*, 618 F.3d at 1232 (citing *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)). Even "substantial, diligent, or good faith efforts are not enough; the only issue is compliance." *Id.*; *McComb*, 336 U.S. at 191 ("An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently."); *see also TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 880 (Fed. Cir. 2011) ("Although a defendant's diligence and good faith efforts are not a defense to contempt, these factors may be considered in assessing penalties, a matter as to which the district court has considerable discretion.").

Additionally, the court will apply the summary judgment standard to the issues of the defendants' contempt. Summary judgment is appropriate as to any claim or defense where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the moving party has met its burden to show no dispute exists, a district court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving

party has adequately supported its motion, the nonmovant has the burden of showing that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Ultimately, the court's function is not to resolve issues of material fact, but rather to determine whether there are any such issues to be tried. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment. *Id.* at 248. Applying the typical summary judgment standard in a contempt proceeding is acceptable because the court does not *weigh* the evidence, but instead determines whether there are any material factual disputes as to the alleged contemnors' compliance with the injunction.

## III.  Analysis

There are relatively few disputed facts in these contempt proceedings. The defendants do not dispute that the products were advertised or marketed as alleged. Rather, the defendants' contentions largely involve legal argument and their assertions that there are questions of material fact that either make contempt judgment inappropriate or, at minimum, require an evidentiary hearing before imposition of a contempt sanction. The three response briefs address these contentions in different ways and sequences,

although each "adopts" each others' arguments. The court will address these arguments by first reviewing the elements of contempt liability and next addressing the various defenses raised.

First, the defendants contend that the FTC failed to meet its burden to show "by clear and convincing evidence" that the injunction itself was valid and lawful and that it was unambiguous. Moreover, the defendants present a number of reasons why they believe the FTC *cannot* prove this element of contempt because the court's May 11 Order and August 7 Order have invalidated or otherwise improperly modified the injunction. Second, the defendants contend that a material issue of fact remains as to whether a "representation" requiring substantiation was made. In a related argument, the defendants contend that the advertising at issue constitutes non-actionable puffery, so they should not be subject to a contempt sanction for such permissible statements. Next, defendant Wheat contends that he was unable to comply with the terms of the injunction for some of the time period at issue. Finally, the defendants argue that they did not understand the injunction to prohibit the types of statements they made, so they should, at

minimum, be able to present evidence of their understanding of and effort to comply with the injunction.[4]

### A.    The Injunction was Valid and Unambiguous

The defendants first argue that the FTC failed to carry its burden to show their contempt because the FTC did not show that the injunctions were valid and lawful or clear and unambiguous. The defendants correctly point out that the FTC does not specifically address this element of contempt relief in its initial motion. However, given the history of this case and the previously issued orders of the court, the FTC did not necessarily *need* to in order for the court to conclude that the injunction was valid and unambiguous. Most importantly, the issue—and the majority of the

---

[4] The FTC also moved for summary judgment on the previously asserted affirmative defense of estoppel. *See* FTC's Mot. Br. at 34–35 [Doc. No. 446-1]. Hi-Tech and Wheat admitted nearly all the facts in support of the argument, *see* [Doc. No. 478 ¶¶ 418–425] (admitting all but ¶ 425), although Hi-Tech asserted that an issue of fact remained as to the defense [Doc. No. 480, at 24, 46 n.15, 50]. Hi-Tech deferred presenting argument on the estoppel issue to co-defendant Wheat's response brief. *Id.* at 50 ("There are numerous additional reasons that the Court should grant an evidentiary hearing, which are addressed in co-defendant Mr. Wheat's response. To avoid repetition, Corporate Defendant adopts each the [sic] arguments in that response, including . . . the defense[] of estoppel . . . as fully set forth herein full [sic].") However, Wheat did not address the argument in his brief at all. Thus, the court considers the estoppel defense waived. *See* LR 7.1(B) ("Failure to file a response shall indicate that there is no opposition to the motion.").

arguments the defendants present as to why the injunction *cannot* serve as the basis for contempt liability now—has already been addressed.

In both the May 11 Order and August 7 Order [Doc. Nos. 390, 422], the court explained the kind of "competent and reliable scientific evidence" required to substantiate claims made under the injunction. The defendants argue—for the fourth time—that the court's orders were incorrect. They suggest that the court violated the law of the case, violated Fed. R. Civ. P. 60(b) or 65, improperly modified the injunction, voided the injunction by its interpretation, and that the defendants themselves did not understand the injunction the way the FTC and the court do now. Most of these arguments have been presented in some form or another in the opposition to the FTC's original show cause motion, the defendants' motion for reconsideration, and the motion for an interlocutory injunction. And the arguments that weren't presented in those motions could (or should) have been. In any case, the court has previously addressed the question of the injunction's scope and meaning. *See* May 11 Order at 6–12 [Doc. No. 390] (addressing the kind of evidence relevant to contempt under the terms of the injunction); August 7 Order at 5–18 [Doc. No. 422] (denying motion for reconsideration, explaining why the defendants had "fair notice" of the prohibited conduct, and clarifying why and how collateral estoppel bars re-litigation of the fact question as to these

claims); *see also* [Doc. No. 433, at 2–4] (hereinafter "the September 18 Order") (holding the defendants' "repetitious" arguments did not present a substantial ground for difference of opinion to justify interlocutory appeal).

The overarching purpose of the injunction in this case should be used as a guide to its interpretation. The FTC prevailed against the contempt defendants on summary judgment; the court concluded there was no question of material fact, and the FTC was entitled to judgment as a matter of law. In the order granting summary judgment, the court concluded that the FTC was entitled to a permanent injunction.

> The evidence clearly demonstrate[d] that the corporate defendants' previous violations of the FTC Act were numerous and grave. These parties, acting through their corporate officers, did not engage in a harmless advertising scheme with an isolated incidence of deception; instead, their advertising was chock-full of false, misleading, and unsubstantiated information. This deceptive propaganda was not simply distributed through magazine advertisements and other general circulation media that could easily be "tuned-out" by consumers; rather, it was also sent directly to pre-determined lists of individuals who were especially vulnerable to such targeted advertisement. In short, the defendants dispensed deception to those with the greatest need to believe it, and—not surprisingly—generated a handsome profit for their efforts.
> . . . .
> Thus, it is clear to the court that the recurrence of the corporate defendants' violations could cause significant harm to consumers.

*FTC. v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1209–10 (N.D. Ga. 2008); *see also id.* at 1214–15 (concluding injunctive relief was similarly

warranted against Dr. Wright). Moreover, before entering the proposed injunction the FTC sought in its summary judgment motion, the court gave the defendants an opportunity to "address issues raised by the proposed" injunction orders and present their objections. *Id.* at 1215. Contempt defendants Hi-Tech and Dr. Wright filed objections, but none of their objections had anything to do with the issues in these contempt proceedings. *See generally* [Doc. Nos. 220, 221]. The court entered the final judgment and permanent injunctions against the defendants on December 16, 2008 [Doc. Nos. 229, 230]. The defendants had ample opportunity to oppose the present injunctions,[5] so they are interpreted in light of the purpose of the litigation, not as negotiated contracts between the parties.[6] *Cf. Sierra Club v. Meiburg*, 296 F.3d 1021, 1031–32 (11th Cir. 2002) ("[B]ecause consent decrees are normally compromises between parties with opposing positions in which each

---

[5] Even more, the defendants moved to alter or amend the judgment on December 31, 2008 [Doc. No. 232], and the court denied that motion on January 16, 2009 [Doc. No. 239]. The Eleventh Circuit Court of Appeals affirmed the judgment of the court. *Cf. TiVo*, 646 F.3d at 889 ("The time to appeal the scope of an injunction is when it is handed down, not when a party is later found to be in contempt." (citing *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948) ("It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy."))).

[6] Much of the authority cited by the defendants discussed how to interpret a *consent* decree, which is not what we have here.

party gives up their rights to litigation and to prove their position, consent decrees should be interpreted as written, 'and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.'" (quoting *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971))). While the scope of a consent injunction may be strictly limited to its "four corners," here the court considers whether the interpretation "satisf[ies] the purposes of one of the parties to it." *Armour & Co.*, 402 U.S. at 682.

The court's previous orders addressing interpretation of the injunction promote the FTC's mission of protecting the public. Those orders provide the clear and convincing evidence that the injunction was valid and lawful. Nothing added in the three response briefs by the defendants has changed the court's mind, and the court rejects their contentions as without merit. The court concludes that the first two elements required to establish contempt liability have been satisfied. The court now turns to the question of whether the defendants' conduct violated the injunction.

### B.     The Defendants Made Unsubstantiated Statements Prohibited by the Injunctions

The FTC alleges that Hi-Tech, Wheat, and Smith's conduct violates the following provisions of the final judgment and permanent injunction order: (1) Section II, prohibiting them from claiming their products "cause[] rapid or

substantial loss of weight or fat," or "affect[] human metabolism, appetite, or body fat," unless those claims are substantiated by "competent and reliable scientific evidence" at the time the representation was made; (2) Section VII, prohibiting them from making representations regarding "comparative benefits, performance, safety, or efficacy" for covered products unless such representations are substantiated by "competent and reliable scientific evidence" at the time the representation was made; and (3) Section VI, requiring them to "make clearly and prominently" a specified warning when they make efficacy claims about any covered product containing yohimbine. *See* Hi-Tech Order at 12–13, 15–17 [Doc. No. 230]. The FTC also claims Dr. Wright violated Section II of the final judgment and permanent injunction order against him, prohibiting him from making any representations regarding "any weight loss product" that claims such product "causes rapid or substantial loss of weight or fat" or "affects human metabolism, appetite, or body fat," unless such representation is substantiated by "competent and reliable scientific evidence" at the time the representation was made. *See* Wright Order at 7–8 [Doc. No. 229]. It is undisputed that the defendants did not possess and rely upon "competent and reliable scientific evidence," as described in the court's summary judgment order, May 11 Order, and August 7 Order, for any of the statements identified in the FTC's contempt

allegations. Further, the defendants do not dispute that their product

packaging and marketing materials make the "express statements" identified

in the FTC's statement of material facts.

However, the defendants *do* deny that these statements "represent,

expressly or by implication . . . that [the products]" make the types of claims

that require substantiation. *See, e.g.*, Wheat & Hi-Tech Resp. to Statement of

Material F. ¶ 135 [Doc. No. 478]. They object that the FTC's "alleged fact

states an ultimate issue or legal conclusion" and that the statements are

puffery. *Id.*

The court can conclude based on the undisputed facts that the

advertisements make the claims subjecting them to the substantiation

requirement. The court discussed how to determine whether an

advertisement makes a representation in its 2008 summary judgment order:

> When assessing the meaning and representations conveyed
> by an advertisement, the court must look to the advertisement's
> overall, net impression rather than the literal truth or falsity of
> the words in the advertisement. *FTC v. Peoples Credit First, LLC*,
> No. 8:03-CV-2353-T-TBM, 2005 U.S. Dist. LEXIS 38545, at *20–
> 25, 2005 WL 3468588, at *5–6 (M.D. Fla. Dec. 18, 2005) (finding
> that an advertisement was implicitly deceptive by looking at the
> net impression that it was likely to make on the general public).
> If the advertisement explicitly states or clearly and conspicuously
> implies a claim, the court need not look to extrinsic evidence to
> ascertain whether the advertisement made the claim. *See In re*
> *Thompson Med. Co., Inc.*, 104 F.T.C. 648, 311–12 (1984) (noting
> that when an advertisement unequivocally states a claim, "it is

reasonable to interpret the ads as intending to make [it]"); *QT, Inc.*, 448 F. Supp. 2d at 958 ("Where implied claims are conspicuous and reasonably clear from the face of the advertisements, extrinsic evidence is not required.") (internal citations omitted). However, if the advertisement faintly implies a claim, the court may certainly decline from concluding that the advertisement makes such a representation without extrinsic evidence of consumer perceptions.

*Nat'l Urological Group*, 645 F. Supp. 2d at 1189; *id.* at 1189 n.12 ("[T]he court is well-equipped to discern express claims or clear and conspicuous implied claims from the face of the advertisement.").[7]

> 1. *Hi-Tech, Wheat, and Smith's Compliance with Sections II and VII of the Injunction Order*

The court has surveyed the advertisements, and it concludes there is no dispute of material fact regarding the following express statements that comprise the representations alleged by the FTC:

> a. Representations that Fastin "causes rapid or substantial loss of weight or fat":

- "WARNING: EXTREMELY POTENT DIET AID! DO NOT CONSUME UNLESS *RAPID FAT AND WEIGHT LOSS* ARE YOUR DESIRED RESULT" FTC Statement of Material Facts (SMF) ¶¶ 138, 146, 152, 160 [Doc. No. 478] (emphasis added);

---

[7] The summary judgment order also discussed the materiality requirement under the FTC Act; however, the injunction order contains no materiality requirement.

- "EXTREME WEIGHT LOSS GUARANTEED!" *Id.* ¶ 138;

- "Rapid Fat Loss" *Id.* ¶¶ 150, 152, 160, 162;

- "Rapid Fat Burner" *Id.* ¶¶ 152, 156;

- "Rapid Fat Loss Catalyst" *Id.* ¶¶ 152, 154, 156, 160.

> b. Representations that Fastin "affects human metabolism, appetite, or body fat":

- "Extreme Fat Burner" *E.g.*, *id.* ¶ 164;

- "Rapid Fat Burner" *E.g.*, *id.* ¶¶ 170, 174;

- "Rapid Fat Loss [Catalyst]" *E.g.*, *id.* ¶¶ 170, 174;

- "WARNING: EXTREMELY POTENT DIET AID! DO NOT CONSUME UNLESS *RAPID FAT AND WEIGHT LOSS* ARE YOUR DESIRED RESULT" *E.g.*, *id.* at ¶ 174 (emphasis added);

- "Increases the metabolic rate, promoting thermogenesis (The Burning of Stored Body Fat)." *E.g.*, *id.* ¶¶ 166, 170, 174, 182 (emphasis);

- "Curbs the Appetite!" *Id.* ¶ 184;

- "Fastin® has both immediate and delayed release profiles for *appetite suppression*, energy and *weight loss*." *Id.* ¶ 186 (emphasis added).

       c.  Representations that Lipodrene "causes rapid or

          substantial loss of weight or fat":

- "LIPODRENE WILL CAUSE RAPID FAT AND WEIGHT LOSS WITH USAGE." *Id.* ¶¶ 206, 208;

- "LIPODRENE® WILL CAUSE RAPID FAT AND WEIGHT LOSS WITH USAGE." *Id.* ¶ 210.

       d.  Representations that Lipodrene "affects human

          metabolism, appetite, or body fat":

- "LIPODRENE WILL CAUSE RAPID FAT AND WEIGHT LOSS WITH USAGE." *Id.* ¶¶ 206, 208;

- "LIPODRENE® WILL CAUSE RAPID FAT AND WEIGHT LOSS WITH USAGE." *Id.* ¶ 210;

- "DO NOT CONSUME UNLESS FAT LOSS AND WEIGHT LOSS ARE YOUR INTENDED RESULT" *E.g.*, *id.* ¶ 222;

- "Increases the metabolic rate, promoting thermogenesis (the burning of stored body fat)" *Id.* ¶¶ 230, 234;

- "FOR ADVANCED APPETITE CONTROL and METABOLIC STIMULATION." *Id.* ¶¶ 236, 242;

- "FOR ADVANCED APPETITE CONTROL AND METABOLIC STIMULATION." *Id.* ¶¶ 238, 244;

- "FOR ADVANCED APPETITE CONTROL and METABOLIC STIMULATION!" *Id.* ¶ 240*;*

- "Lipodrene® is truly a Fat Assassin™ unlike any other 'Fat Burner.'" *Id.* ¶ 212;

- "Slows the absorption of serotonin, which helps in weight management by controlling food cravings and supressing [sic] the appetite." *Id.* ¶ 242;

- "Slows the absorption of serotonin, which helps in weight management by controlling food cravings and suppressing the appetite" *Id.* ¶ 246;

- "Hi-Tech's Flagship *Fat Loss Product* with 25 mg Ephedra Extract— Annihilate Fat" *Id.* ¶ 226;

- "Lipodrene® not only remains Hi-Tech's *flagship fat-burner* . . ." *Id.* ¶ 228 (emphasis added);

- "Lipodrene® is the right move to *strip away fat* . . . !" *Id.* (emphasis added).

      e. <u>Representations that Benzedrine "causes rapid or substantial loss of weight or fat":</u>

- None.

      f. <u>Representations that Benzedrine "affects human metabolism, appetite, or body fat":</u>

- "*ANNIHILATE THE FAT* WHILE FIRING UP YOUR ENERGY!" *Id.* ¶¶ 266, 270

21

- "Unmatched Anorectic Activity to Manage Caloric Intake" *Id.* ¶ 272.[8]

       g.  Representations that Stimerex-ES "causes rapid or substantial loss of weight or fat":

- None

       h.  Representations that Stimerex-ES "affects human metabolism, appetite, or body fat":

- "Stimerex-ES® is hardcore stimulant action for those who want their fat-burner to light them up all day as their pounds melt away!" *E.g.*, *id.* ¶ 295;

- "Stimerex-ES® . . . is the Strongest 'Fat Burner' on the Market – Hands Down!" *Id.* ¶ 297;

- "Stimerex-ES® is undeniably the most powerful, [sic] fat loss and energy boost formula ever created." *Id.*;

- "Stimerex-ES® will help you assassinate fat and speed things up!" *Id.*;

- "Stimerex-ES® is designed as the ultimate fat burner/energizer." *Id.* ¶ 299;

- "Stimerex-ES® Fat Burner/Energizer" *Id.* ¶ 305;

- "High Performance Thermogenic Intensifier for Maximum Fat Loss" *Id.* ¶ 305.

---

[8] "Anorectic" means "lacking appetite." Webster's Third New International Dictionary 89 (1993).

i. Representations of the "comparative benefits" of
Stimerex-ES to Ephedrine-Containing Dietary
Supplements:

- "The benefits of ephedra are now 'Back in Black!'" [beneath a picture of the black, diamond-shaped Stimerex-ES tablets] *Id.* ¶ 307;

- "Don't be fooled by the rumors, Hi-Tech's Thermo-Z™ Brand Ephedra Extract does not violate any federal or state ban on ephedrine-containing dietary supplements. We can still provide you with 25mg ephedra that you've always enjoyed." *Id.*[9]

     **2.  *Hi-Tech, Wheat, and Smith's Compliance with Section VI of Injunction Order (Yohimbine Warning)***

Additionally, the court concludes that there is no genuine dispute of material fact that the advertisements do not contain the yohimbine warning required by Section VI of the Hi-Tech Order. Fastin, Lipodrene, Benzedrine, and Stimerex-ES all contain yohimbine. *See* SMF ¶ 309 [Doc. No. 478]. As discussed above, those products' packaging and labels make efficacy claims. Section VI of the Hi-Tech Order requires that any yohimbine-containing

---

[9] The court notes that none of the defendants addressed these claims directly in their briefs. Instead, they merely made the objections as noted above. Thus, the defendants did not take the opportunity to argue what "legal conclusion" the court should make regarding these claims. *See, e.g.*, Hi-Tech & Wheat Resp. to SMF ¶ 308 [Doc. No. 478] ("Defendants object as the alleged fact states an ultimate issue or legal conclusion . . . .").

product making an efficacy claim "shall make clearly and prominently[] *the*
*following disclosure*: **WARNING**: This product can raise blood pressure and
interfere with other drugs you may be taking. Talk to your doctor about this
product." Hi-Tech Order at 15–16 [Doc. No. 230] (italic emphasis added). It is
undisputed that none of the products contained this exact disclosure during
the period of time for which the FTC seeks a contempt judgment.

 The defendants contend that there is a genuine issue of material fact as
to whether they complied with the yohimbine-warning requirement. Wheat
argues, "[I]t is not undisputed that [he] has taken no steps to include this
warning in Hi-Tech's advertising or labels," and that it was "an apparent
oversight" that "is in the process of being corrected." Wheat Mem. in Opp'n to
Mot. Seeking Contempt at 28, 31 [Doc. No. 475].  The injunction did not
require Wheat to "take steps" to include the warning; the order required the
warning to be made. There is no question that the Hi-Tech defendants'
conduct violated the injunction. However, at the contempt hearing, the court
will permit evidence of the defendants' *present* compliance with the
yohimbine-warning requirement in considering whether any sanction is
necessary to coerce compliance with this provision.

### 3.  *Dr. Wright's Compliance with Section II of the Injunction Order (Endorsements)*

Like the Hi-Tech defendants, Dr. Wright's injunction prohibits him from making unsubstantiated claims for weight loss products. He is enjoined from "making any representation, in any manner, expressly or by implication, including through the use of endorsements, that" a covered weight loss product "causes rapid or substantial loss of weight or fat" or that such product "affects human metabolism, appetite, or body fat" unless the representation is substantiated by competent and reliable scientific evidence. Wright Order at 7-8 [Doc. No. 229]. The court concludes that Dr. Wright's endorsement of Fastin violated the injunction because it represents that Fastin "affects . . . body fat" without proper substantiation as discussed above: "As a Weight Loss Physician I am proud to join Hi-Tech Pharmaceuticals in bringing you a Truly Extraordinary Weight Loss Product. I believe Fastin® is the Gold Standard by which all Fat Burners should be judged." Wright's Statement of Material F. ¶ 20 [Doc. No. 483].

### 4.  *Puffery*

Finally, all the defendants argue that the representations they made regarding the products here are non-actionable puffery, so the court cannot

find them in contempt based on those statements. The court considered the

same argument in the 2008 summary judgment order:

> [T]he defendants argue that summary judgment is precluded because most of the advertising claims challenged by the FTC constitute non-actionable puffery, and thus, cannot be considered violations of Sections 5 or 12.
>
> Although courts have defined puffery in numerous ways, "'puffing' refers generally to an expression of opinion not made as a representation of fact." *FTC v. U.S. Sales Corp.,* 785 F. Supp. 737, 746 (N.D. Ill. 1992); *see also In re Sterling Drug, Inc.,* 102 F.T.C. 395, 749 (1983) ("Puffing claims are usually either vague or highly subjective and, therefore, incapable of being substantiated."). While the law affords a seller "some latitude in puffing his goods . . . he is not authorized to misrepresent them or to assign to them benefits they do not possess. Statements made for the purpose of deceiving prospective purchasers cannot properly be characterized as mere puffing." *U.S. Sales Corp.,* 785 F. Supp. at 746; *see also United States v. Simon,* 839 F.2d 1461, 1468 (11th Cir. 1988) (citing *United States v. New South Farm & Home,* 241 U.S. 64 (1916)) ("[W]hen a proposed seller goes beyond [exaggerating the qualities which the article has and] assigns to the article qualities it does not possess, [when the seller] does not simply magnify in opinion the advantages [but] falsely asserts their existence, he transcends the limits of 'puffing' and engages in false representations and pretenses."). Thus, the Eleventh Circuit has concluded that when an advertiser places "otherwise general assertions about the value [of a product] into a concrete factual setting," the advertiser creates representations that are either true or false, not mere puffery. *Simon,* 839 F.2d at 1468.

*Nat'l Urological Group*, 645 F. Supp. 2d at 1206. In its original summary

judgment order, the court concluded that the advertisements then at issue

were "indisputably riddled with puffery and, thus, create many overall

impressions that could not serve as the basis for Section 5 or Section 12

violations." *Id.* However, the court concluded puffery was not a valid defense

under the circumstances:

> To be sure, some of the advertisements' direct language
> supporting these claims contains puffery; however, the
> combination of this puffery with the concrete, factual statements
> and phrases that also comprise the advertisements results in the
> claims highlighted in the complaint. The fact that puffery is
> present cannot serve as a shield for the advertisements'
> deceptive, factual representations.

*Id.*

The court recognizes that the statements that are the subject of this

contempt proceeding are not as concrete as those that were the subject of the

original litigation. *See Id.* (describing the claims in the complaint as "factual

statements that can be verified by research and science" and as "concrete,

factual statements and phrases"). Here, it is undisputed that the defendants

attempted to back away from their previous, concrete claims while still

advertising the products with more puffing. *Compare, e.g., id.* at 1191

("Thermalean is clinically proven to enable users to lose 19% of their total

body weight, lose 20–35% of abdominal fat, reduce their overall fat by 40–

70%, decrease their stored fat by 300%, and increase their metabolic rate by

76.9%"), *with* SMF ¶ 142 [Doc. No. 478] ("The World's Most Advanced Weight

Loss Aid Ever Developed!"), *and id.* ¶ 148 ("Revolutionary Diet Aid" and

"Extremely Potent Diet and Energy Aid"). The essential question then is

whether language that might otherwise be normal puffing may nonetheless be subject to the injunction's requirements.

The answer to that question is "yes," for two reasons. First, the court has already recognized that an injunction may prohibit more conduct than what originally subjected the defendants to liability. *See Nat'l Urological Group*, 645 F. Supp. 2d at 1215 ("[T]he court cautions the defendants that it is persuaded by case law that 'injunctive relief may be broader than the violations alleged in the complaint as long as the relief is reasonably related to the violations of the FTC Act which occurred, and is not too indefinite.'" (citing *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1275 (S.D. Fla. 1999) ("Broad injunctive provisions are often necessary to prevent transgressors from violating the law in a new guise." (internal quotation marks omitted)))); August 7 Order at 7–9 [Doc. No. 422] (citing *SEC v. Goble*, 682 F.3d 934, 952 (11th Cir. 2012) ("[W]here the public interest is involved, the court's equitable power has a 'broader and more flexible character.'"). So, while puffery may be a defense to an allegation of a direct violation of the FTC Act, puffery is not necessarily a defense to an allegation of contempt of a broad injunctive provision.

Second, reading the injunction's prohibitions, in context, shows that the purpose of the injunction was to prohibit the exact statements made by the

defendants. For example, Section I of both injunctions explicitly prohibits false "clinically proven" claims of the type referenced in the preceding paragraph. *E.g.* Hi-Tech Order at 10–11 [Doc. No. 230] (prohibiting a false representation that a weight loss product "is clinically proven to cause or causes rapid and substantial weight loss . . . [or] is clinically proven to inhibit the absorption of fat, suppress appetite, or increase metabolism without dangerous side effects"). Section II, in comparison, covers a *much* broader set of representations. For example, the defendants are enjoined from "making any representation, in any manner, expressly or by implication, including through the use of endorsements, that . . . [any weight loss product] causes rapid or substantial loss of weight or fat . . . [or] affects human metabolism, appetite, or body fat," unless those representations are true and non-misleading and substantiated by competent and reliable scientific evidence. *Id.* at 12–13. These two prohibitions serve different purposes, and they have different effects.

Thus, the defendants cannot escape liability for contempt by making the exact representations prohibited by the injunction merely because those representations would ordinarily be considered puffery. To be sure, the injunction is not so broad as to prohibit all puffery claims—in the court's identification of the offending statements above, it has concluded some of the

alleged statements either do not make the accused representation or merely puff qualities of the products. But where the injunction's plain language prohibits *any* express or implied representation that a product "affects" appetite, metabolism, or body fat, or that a product "causes rapid *or* substantial loss of weight *or* fat," it makes no sense to permit the defendants to make statements like "Curbs the Appetite," "increases the metabolic rate," "Rapid Fat Loss," "annihilate" or "strip away fat", and "Rapid Fat Loss." Accordingly, the court concludes that puffery is not a justifiable defense to the allegation of contempt of the injunctions.[10]

### 5. Conclusion

In sum, the FTC has shown by clear and convincing evidence that the defendants violated the permanent injunctions by making the

---

[10] The court notes that Wheat argues that there are disputed issues of fact because "a factual examination of the advertisements at issue is required to determine if the challenged statements are permissible under puffery or other legal doctrines," and "a factual analysis of each ad and the context of same must be undertaken[, for which] Mr. Wheat's testimony [] is essential." Wheat Mem. in Opp'n to Mot. Seeking Contempt at 28, 30 [Doc. No. 475]. But Wheat does not indicate—either in his brief or in his additional material facts—what "essential" testimony he might give or why/how it would establish the advertisements are puffery. At best, he states that some statements should be "examined" for "claims that have been recognized as permissible," which would be a legal argument. However, none of the statements Wheat identified are statements that the court concludes are the basis for contempt liability. Thus, Wheat has not presented a genuine issue of material fact relating to the puffery defense.

representations described above. Thus, the court now turns to the defendants'
defenses to the FTC's prima facie case of contempt.

### C.   The Defendants' Defenses to Contempt

#### 1.   *Wheat's Ability to Comply with the Terms of the Injunction*

Wheat contends that he was not "in a position to either violate or
comply" with the injunction between January 2009 and September 2010. *See*
Wheat Mem. in Opp'n to Mot. Seeking Contempt at 31–33 [Doc. No. 475]. It is
undisputed that Wheat was incarcerated from March 16, 2009, through
September 15, 2010. During that time, Wheat had appointed an advisory
board to help manage Hi-Tech and appointed Victor Kelley as interim CEO.
Wheat also claims in a declaration (submitted in June 2012 in support of his
motion for reconsideration) that he has suffered from "anxiety and panic
attacks since 1993" and he has been "under continuous medical supervision
since that time." Wheat Decl. ¶ 3 [Doc. No. 408-1]. He claims that around
November 2009, while he was incarcerated, the anxiety and panic attacks
"increased to the point that [he] was no longer able to serve as President of
Hi-Tech," requiring his appointment of Kelley as interim CEO. *Id.* at ¶ 3.
Kelley also submitted a declaration in support of Wheat's sur-reply. In it, he
stated that Wheat has suffered panic attacks since 1991, and Wheat "had a
particularly difficult time due to the absence of medication and the nature of

his confinement," which precipitated Kelley's appointment as CEO. Kelley

Decl. ¶ 8 [Doc. No. 487-7]. Thus, Wheat contends, he did not and could not

execute any authority over Hi-Tech, and the extent and period of his inability

to comply presents a question of material fact to be resolved at an evidentiary

hearing.

"In order to succeed on the inability defense, the alleged contemnor

'must go beyond a mere assertion of inability' and establish that he has made

'in good faith all reasonable efforts' to meet the terms of the court order he is

seeking to avoid." *Commodity Futures Trading Comm'n v. Wellington*

*Precious Metals, Inc.*, 950 F.2d 1525, 1529 (11th Cir. 1992) (citation omitted).

The burden is on the contemnor to "produce detailed evidence specifically

explaining why he cannot comply." *Parker v. Scrap Metal Processors, Inc.*,

468 F.3d 733, 740 (11th Cir. 2006) (citing *United States v. Roberts*, 858 F.2d

698, 701 (11th Cir. 1988)). Moreover, "unsupported, conclusory, and general

attestation[s]" lack probative value and are insufficient to prevent a grant of

summary judgment." *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1310 (11th

Cir. 2012) (citing *Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000)

("This court has consistently held that conclusory allegations without specific

supporting facts have no probative value. One who resists summary

judgment must meet the movant's affidavits with opposing affidavits setting

forth specific facts to show why there is an issue for trial." (citation and internal quotation omitted))); *accord Atwater v. Nat'l Football League Players Ass'n*, 626 F.3d 1170, 1180 (11th Cir. 2010).

As an initial matter, according to Wheat's own supplemental declaration he was only out of the CEO position for approximately five months and resumed the position around May 2010. Supp. Wheat Decl. ¶ 5 [Doc. No. 487-8]. So he cannot also argue he was incapable of controlling Hi-Tech until September 2010. Second, Wheat's conclusory and self-serving assertions that his anxiety and panic attacks made him "no longer able to serve" as President of Hi-Tech are not "detailed evidence specifically explaining" how he was unable to comply. *See Parker*, 468 F.3d at 740. Moreover, they lack specificity and, consequently, probative value. *See Kernel Records*, 694 F.3d at 1310. Kelley's similar declaration suffers from the same deficiency, even if it corroborates the assertion that Wheat suffered from anxiety while incarcerated. However, such an assertion does not address how Wheat was unable to comply with the order, nor does it show he was not involved in the decisions of Hi-Tech during the time period.[11] Thus, Wheat

---

[11] Other evidence would appear to show he maintained control. *See* FTC's Pretrial Exhibit 105, at 9:23–24 [Doc. No. 446-13, at 221] (in a February 2010 conversation, "Stevie" asking Wheat to email him "marching orders if you have anything you want me to do").

has not met his burden of production in presenting his defense of inability to comply, so this defense must be rejected. *See Wellington Precious Metals, Inc.*, 950 F.2d 1529 ("The burden shifts back to the initiating party only upon a sufficient showing by the alleged contemnor.").

### 2. *Reliance on Counsel*

The defendants argue that their good faith reliance on counsel's advice should, at minimum, mitigate the sanction to be imposed. The court agrees with the FTC that good faith is, at best, relevant to coercive contempt sanctions, and not to compensatory sanctions. But it is a disputed question of fact whether the defendants' reliance on counsel was *in good faith*. *See* FTC's Pretrial Exhibit 106 at 12:2–6 [Doc. No. 446-13, at 242] (Wheat stating in a phone conversation, "[I]f we ever have to get drug back before [Judge Pannell], I'm going to put [attorneys] Jody [Schilleci] and Ed [Novotny] up— you know, they're the *scapegoats*, in essence. Hey, you gave me this advice." (emphasis added)).

It is undisputed that Wheat received legal advice blessing some of his advertisements as non-actionable puffery—a conclusion the court has rejected and which in no way absolves the defendants of their contempt liability. It is also undisputed that Wheat received *other* legal advice that his conduct might subject him to contempt proceedings *and* contempt liability.

34

While he and several of his counsel may *strenuously* disagree with this court's rulings—they may have believed and still believe the court was wrong on several issues—some of Wheat's counsel accurately predicted the path these contempt proceedings have taken. Wheat understood this risk and sought legal counsel to insulate himself from a possible contempt sanction. *See, e.g.*, *id.* at 12:13–14 ("We can't go out there and be butt naked.").

In any case, the sanctions ultimately imposed are within the discretion of the court. So the court will permit testimony from Wheat and his attorneys at the contempt hearing in order to make a factual finding as to whether his conduct was truly in good faith.

**D.    Appropriate Remedies for Civil Contempt**

The FTC seeks two types of sanctions for the defendants' contempt. First, the FTC asks the court to order compensatory sanctions to provide consumers with full remedial relief; and the FTC contends that gross revenues less refunds and returns is the appropriate measure of compensatory sanctions. With respect to Hi-Tech, Wheat, and Smith, the FTC contends it is undisputed that they generated $27.3 million in revenue from the sale of Fastin, Lipodrene, Benzedrine and Stimerex-ES during the applicable time period. The FTC claims Dr. Wright should be ordered to pay just over $16.1 million. Second, the FTC asks the court to incarcerate Wheat

and Smith as a coercive sanction to compel their and Hi-Tech's compliance with the permanent injunction.

The defendants contend that, at minimum, there is a disputed question of fact as to what type and as to what degree of sanctions should be imposed against them. Hi-Tech argues briefly that any sanction imposed would be improperly punitive, "for having engaged in conduct that was not, when committed, specifically prohibited by the Injunction." Hi-Tech Mem. in Opp'n to Mot. Seeking Contempt at 40-41 [Doc. No. 480]. The court rejects this argument: The injunction specified the enjoined conduct, the defendants' counsel knew the interpretation of the injunction adopted by the court was a possibility, and a dispute over that interpretation does not alter the injunction's meaning.

Sanctions for civil contempt are within the discretion of the court:

A contempt fine is considered civil and remedial if it either coerces the defendant into compliance with the court's order, or compensates the complainant for losses sustained. A contemnor need only be afforded the opportunity to purge his sanction of a fine, in the civil context, where a fine is not compensatory. In the civil contempt context the discretion the district court has to impose noncoercive sanctions is particularly broad and only limited by the requirement that they be compensatory.

*FTC v. Leshin*, 618 F.3d 1221, 1239 (11th Cir. 2010) (citations and internal

quotations omitted). The discretion includes the ability to order disgorgement

of gross receipts or revenue. *Id.* at 1237.[12]

Additionally, courts have incarcerated defendants to encourage their

compliance with an injunction. *See, e.g.*, *FTC v. Leshin*, No. 0:06-CV-61851-

UU, 2011 WL 617500, at *2 (S.D. Fla. Feb. 15, 2011) (report and

recommendation of magistrate judge), *adopted at* 2011 WL 845065 (S.D. Fla.

Mar. 8, 2011). Such a sanction is appropriate as long as it is "coercive and

conditioned on continued contumacious conduct," *Combs v. Ryan's Coal Co.*,

785 F.2d 970, 982 (11th Cir. 1986) (calling this the "classic exercise of the

civil contempt power"), and it should be the "least possible power adequate"

to coerce compliance, *Spallone v. United States*, 493 U.S. 265, 276 (1990).

Here, the court finds a dispute of facts exists as to the nature and

degree of sanctions that are most appropriate. Accordingly, while sanctions

*will* be imposed on each party,[13] the court will set them only after a hearing.

---

[12] The FTC cites a Second Circuit Court of Appeals case for the proposition
that the court is "*not* free to exercise its discretion and withhold an order in
civil contempt awarding damages, to the extent they are established." *See
Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979).
The court read *Leshin* as confirming the "particularly broad" discretion to
award sanctions, as long as they are compensatory. 618 F.3d at 1239.

## IV.    Conclusion

The court GRANTS Hi-Tech's motion for leave to file a sur-reply [Doc. No. 487], and DENIES Hi-Tech's motions to exclude and to supplement the record [Doc. Nos. 488, 494].

The FTC's pre-hearing motion for entry of contempt judgment [Doc. No. 446] is GRANTED IN PART and DENIED IN PART, as set forth above. As a brief summary, the court concludes that the defendants have made certain representations without substantiation by competent and reliable scientific evidence, as prohibited by the permanent injunctions in this case. Defendants Hi-Tech, Wheat, Smith, and Dr. Wright are therefore liable for contempt of those orders. The nature and amount of the sanction for that contempt remains to be determined. To the extent that the court has determined any issue as a matter of law in this order, no argument or testimony will be permitted on that issue at the hearing on the defendants' contempt.

The court will proceed with a determination regarding sanctions on the defendants' contempt liability.  The parties shall prepare a joint pretrial order, including the relevant sections of the pretrial order form located in Appendix B to the Local Rules of the U.S. District Court for the Northern

---

[13] The court rejects Dr. Wright's argument that *no* sanctions might be imposed. *See* Wright Mem. in Opp'n to Mot. Seeking Contempt at 12 [Doc. No. 482].

District of Georgia.[14]  The parties shall file the joint pretrial order with the court not later than September 20, 2013.

SO ORDERED this 8th day of August, 2013.

/s/ Charles A. Pannell, Jr.
CHARLES A. PANNELL, JR.
United States District Judge

---

[14] The court reminds the parties that the determination regarding sanctions will not be a jury trial.