**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **FEDERAL TRADE COMMISSION,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:04-CV-3294-CAP** |
| | ) | |
| **NATIONAL UROLOGICAL GROUP,** | ) | |
| **INC., et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT HI-TECH
PHARMACEUTICALS, INC., AND JARED WHEAT'S MOTION FOR
RECUSAL OF THE HONORABLE CHARLES A. PANNELL, JR.**

**I.      INTRODUCTION**

Defendants Jared Wheat and Hi-Tech Pharmaceuticals, Inc., ("Hi-Tech")
respectfully submit this memorandum of law in support of the Defendants' Motion
to Recuse the Honorable Charles A. Pannell, Jr.  Federal law requires a district
court judge to disqualify him or herself from a proceeding if a reasonable observer
with an understanding of all of the facts at issue might have significant doubts
about the judge's impartiality.  Proof of bias is not required; instead, merely the
*appearance* of bias is sufficient to require recusal.  Respectfully, the background

and circumstances of this action would likely lead a lay observer to reasonably question the Court's impartiality.

For example, the Court not only disregarded, but altogether refused to consider, Defendants' expert testimony in support of their "competent and reliable scientific evidence" substantiation for advertising claims.   In its January 2014 hearing on sanctions, the Court extensively questioned Mr. Wheat on issues entirely unrelated to the sanctions matter at hand.  Further, the Court incarcerated Mr. Wheat for purportedly failing to comply with the Court ordered product recall *before* he was given the opportunity to show he had complied with the Court's requirements for a recall.

The Court also reviewed and relied on numerous privileged communications in the contempt proceedings.  Unfortunately, that bell cannot be un-rung.  Now that the Eleventh Circuit has reversed and vacated the Court's earlier decision holding Defendants in contempt, Defendants should be permitted to present their defenses in a forum that has not been tainted by a review of confidential, privileged attorney-client communications.  This establishes, at the very least, the appearance of bias – if not actual bias – and strongly advances the need for disqualification.

In sum, it does not matter if the Court is *actually* biased, but rather that a reasonable observer might have doubts about the Court's impartiality, when

considering all of the foregoing factors together.  Since the mere appearance of bias is sufficient to require recusal, the Court should do so here.

## II.   BACKGROUND

### 1.  The Court's 2008 Injunction

This action began in November 2004, when the Federal Trade Commission ("FTC") filed a complaint against the National Urological Group, National Institute for Clinical Weight Loss, Hi-Tech, Mr. Wheat, Mr. Smith, and others (collectively, "Defendants"), alleging that Defendants made "unsubstantiated" and "false" claims about the efficacy and safety of three dietary supplements in violation of Sections 5 and 12 of the FTC Act.  The FTC argued Defendants lacked "adequate substantiation" to support their claims regarding two weight loss products.  *See FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1188 (N.D. Ga. 2008).  Specifically, the FTC challenged Defendants' contention that the products could "cure or prevent serious diseases" such as "obesity," *see* Doc. 172, at 41, and that the products were proven to provide "specific results"—*i.e.*, specified weight or fat loss within a specified period of time, *id.* at 38; *see also id.* at 1, 56.

In November of 2008, the Court granted summary judgment to the FTC, concluding that Hi-Tech's advertising for the products at issue violated the FTC Act.  *See Nat'l Urological Grp.*, 645 F. Supp. 2d at 1215.  The Court explained that, under the FTC Act, any claims about the efficacy or safety of dietary

supplements "must be supported with 'competent and reliable scientific evidence.'" *Id.* at 1190. For the products at issue in the summary judgment motion, the Court adopted "the standard[] set forth by FTC's expert[]," Dr. Louis Arrone, who testified that Defendants should produce product-specific, double-blind, placebo-controlled clinical studies to support their weight-loss and fat-loss claims for Thermalean and Lipodrene. *Id.* at 1202. Although Defendants had significant evidence and studies to support their claims, *see* Doc. 232-1, at 15–16, 24–29 (collecting studies), they conceded that they did not have double-blind, placebo-controlled clinical studies for each individual product. *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1202. Having found violations of the FTC Act, the Court ordered the payment of $15.8 million as consumer redress. *Id.* at 1215.[1] The Court also granted the FTC's request for permanent injunctive relief, ordering the FTC to submit language for the injunction. *Id.*

In December of 2008, the Court entered the injunction—adopting nearly verbatim the injunction drafted by the FTC. *See* Doc. 172-30; Doc. 226, at 2; Doc. 230. The Injunction, among other things, prohibited Defendants from making claims that any product "is an effective treatment for obesity," "causes rapid or substantial loss of weight or fat," "affects human metabolism, appetite, or body

---

[1] The parties have agreed that this judgment amount has been satisfied. *See* Doc. 826.

fat," or is "equivalent or superior to any drug that the [FDA] has approved for sale in the United States for the purpose of treating obesity or causing weight loss" "*unless* the representation … is true and non-misleading, at the time the representation is made, and Defendants possess and rely upon competent and reliable scientific evidence that substantiates the representation." Doc. 230 at 12–13 (emphasis added).

Critically, the injunction did not define "competent and reliable scientific evidence" as Dr. Arrone had. *Compare id.* at 5, *with Nat'l Urological Grp.*, 645 F. Supp. 2d at 1202. Instead, the FTC drafted the injunction to apply the more flexible definition in its Advertising Guide: "Competent and reliable scientific evidence shall mean tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." *Compare* Doc. 230, at 5 *with* Guide at 9.

### 2. The Contempt Action

Three years later, on November 1, 2011, the FTC moved for contempt against Hi-Tech, Mr. Wheat, and Stephen Smith (Hi-Tech's Vice President of Sales) (collectively the "Contempt Defendants") alleging that they had violated the terms of the injunction. Doc. 332. The FTC's contempt motion focused on claims

made to promote three different Hi-Tech products (Fastin, Benzedrine, and Stimerex-ES), none of which were at issue in the summary judgment proceedings, as well as a reformulated version of Lipodrene, *see* Doc. 332-6, at 61, a product that was at issue in the original action. *See generally* Doc. 1; Doc. 446-1, at 1.

In response, Contempt Defendants explained that they had competent and reliable scientific evidence to support each claim challenged by the FTC. *See* Doc. 346, at 14–21. They submitted more than 100 publications to support their advertising. *See* Doc. 368, at Ex. 1 (collecting sources). The sources included detailed, peer-reviewed studies analyzing the effects of the products' active ingredients, including double-blind, placebo-controlled clinical studies of those ingredients (albeit not of the products themselves). *See id.* Contempt Defendants further submitted the declarations of Dr. Timothy S. Gaginella, a pharmacologist with extensive knowledge of the pharmacological effects of dietary supplements, *see* Doc. 359-1, Doc. 387-1, Dr. Patrick Jacobs, a professor of neurological surgery with a substantial background in pharmacological research, *see* Doc. 373-1, and Dr. Terrill Mark Wright, a physician with a primary specialty of internal medicine with a subspecialty in bariatric medicine, Doc. 372-1.

Dr. Jacobs explained that the level of substantiation required is context and claim specific. Doc. 373-1, at 4–8, 10–11. General claims, such as those at issue in the contempt motion, may in most cases be adequately supported by a published,

peer-reviewed study of the active ingredients in the product. *Id.* at 10–11. According to Dr. Gaginella, while double-blind, placebo-controlled clinical studies of the product itself are the best evidence, for many dietary-supplement claims such studies are unnecessary and prohibitively expensive. *See, e.g.*, Doc. 387, at 19, 41. Both Dr. Gaginella and Dr. Jacobs explained that, when all of the relevant and reliable research was considered, there was adequate substantiation for each of Contempt Defendants' claims, most of which they concluded were either puffery or the kind of general, structure/function claims permissible under the Dietary Supplement Health and Education Act of 1994. *See, e.g.*, Doc. 387-1, at 6–7, 43; Doc. 373, at 5–6.

Markedly, this Court refused to consider Dr. Jacobs's and Dr. Gaginella's expert declarations, including their testimony regarding what type of studies could substantiate Contempt Defendants' claims. Doc. 390, at 8–10. Even though the Court had previously explained that, what constitutes competent and reliable scientific evidence "is context specific" and "depend[s] on what pertinent professionals would require for the particular claim made," *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1186, it concluded that "the fact question of what constitutes 'competent and reliable scientific evidence' to substantiate a weight loss claim for any product is part of the law of the case for this matter; it is not subject to re-litigation." Doc. 390, at 8–9. Confusingly, the Court later explained that its initial

reliance on the "law of the case" doctrine was "inartful[]" and that it meant to apply the doctrine of "collateral estoppel," *see* Doc. 422, at 15 n.7. The Court remained steadfast in refusing to consider Contempt Defendants' scientific evidence as to the appropriate substantiation standard under the Injunction. *See id.* at 15–18. This decision was vacated in its entirety and remanded for further proceedings by the Eleventh Circuit on May 5, 2015. Doc. 815.

### 3. The Contempt Judgment and Sanctions Hearing and Order

Contempt Defendants could not meet Dr. Arrone's drug-like substantiation standard; they did not have double-blind, placebo-controlled clinical studies of the Hi-Tech products at issue in the contempt proceeding. Doc. 524, at 16. The Court therefore erroneously held them in contempt of the Injunction. *See id.* at 38–39.

The Court separately considered the issue of appropriate sanctions during a four-day hearing from January 21-24, 2014. At the conclusion of the Contempt Defendants' redirect examination of Mr. Wheat, the Court separately examined Mr. Wheat. The Court repeatedly pursued Mr. Wheat's management and oversight of Hi-Tech's independent contractor workers with an extensive line of questioning completely irrelevant to the sanctions matter at hand and knowing that this was the subject of a grand jury investigation:

> The Court:  […] you have about 15 what you call W-2 employees and you have about 90 what you are calling 1099 employees?
> Mr. Wheat:  Yes, sir.

The Court:   And the 1099 employees, those are what you call your office manager, call them contractors?

Mr. Wheat:  Yes, sir.

The Court:  And there are sort of two sets of 1099 employees, some of them are in sales and some of them are in, what, production?

Mr. Wheat:  Yes, sir.

The Court:   Or manufacturing?

Mr. Wheat:  Yes, sir.

The Court:   How many are in sales?

Mr. Wheat:  Sales I would say approximately 15.

The Court:  Fifteen. All right. So that would leave about 60 that are in what I would call production?

Mr. Wheat:  Yes, sir.

The Court:  And they work in 12-hour shifts?

Mr. Wheat:  Typically, yes, sir.

The Court:   And how many shifts a week would -- well, how long have those contractors been with you, generally?

Mr. Wheat:  I have a company that I hire that then does the -- manages those contract people.

The Court:   Your company?

Mr. Wheat:   Yes, sir.

The Court:   So your company manages those people?

Mr. Wheat:   No, my company pays another company who hires those people.

The Court:   All right. But how long have those employees – do you have a lot of turnover in those contracting production workers?

Mr. Wheat:  Yes, sir. In our office most of the girls like Ms. Harris have been with me 10, 12 years.

The Court:  Those are W-2. I am talking 1099.

Mr. Wheat: Yes, a lot of turnover, your honor.

The Court:  A lot of people been with you for a good, long period of time in the 1099 category?

Mr. Wheat:  Yes, sir, there are some.

The Court:  How long have some of them been with you?

Mr. Wheat: I have had some been there several years.

The Court:  Generally, how many shifts will those people work?

Mr. Wheat:  it depends on how busy we are and how much they want to work. A lot of people have two jobs, you know, they kind of pick up a shift when they need extra money at our place. And once again I don't have my finger on the pulse quite as much on that, I hire a group to do that for our company.

The Court:  do any of them ever work more than 40 hours a week in these 12-hour shifts?

Mr. Wheat: I would say probably, but I would have to get with that company that does it.

The Court:  and you don't pay those people that work more than 40 hours a week any overtime, do you, since they are contractors?

Mr. Wheat: I pay -- call it a temp agency, if you will, who then handles, you know, whether they are W-2, 1099, I am just not sure.

[….]

The Court: These independent contractors when they are in production, when they come to work, do they bring their own tools or do they use the company tools?

Mr. Wheat: Tools? They would bring the pill presses we have.

The Court:  What tools would they bring?

Mr. Wheat: Well, like if somebody is doing electrical work, we don't have that type of stuff, and we hire other 1099 companies to do that.

The Court:  I am talking about somebody using your pill press, your grinder, or this pushing stuff through the screen to get It the right size, all those and driving and packaging and watching pills go in the bottle from the automatic machine, all of those are 1099 employees, aren't they?

Mr. Wheat:  Not all of them. Some of them are, some in the warehouse are W-2 and some are 1099.

The Court:  The ones that are 1099, who provides their protective clothing and mask that I saw in the video?

Mr. Wheat: That is a good question, Your Honor, I'm not sure.

The Court:  You don't provide the mask?

Mr. Wheat:  I don't know if I pay the temp agency who then bills me for that or if I pay that bill directly, I am not sure.

Hearing Transcript, January 21, 2014, Vol. 3, pp. 41-46.

On May 14, 2014, the Court determined that Contempt Defendants should "disgorge" $40,000,950 in "compensatory sanctions"—a number reflecting not just profits, but the total gross receipts for the allegedly violative products (Lipodrene, Fastin, Benzedrine, and Stimerex-ES) during a nearly four-year period (January 1, 2009 to August 31, 2013).  Doc. 650, at 22, 37–38.  It further ordered Contempt Defendants to "recall" all Fastin, Lipodrene, Benzedrine, and Stimerex-ES with allegedly violative product packaging from retail stores.  *Id.* at 28, 38.

### 4.    Reliance on Privileged Communications

To support its sanctions decision, the Court relied at length upon privileged documents and e-mails between Mr. Wheat and his attorneys.  *See id.*, at 11–13. The FTC had obtained Mr. Wheat's privileged communications while he served time in a federal prison on unrelated charges.[2]  Neither Mr. Wheat nor his counsel had access to these emails at the time they were submitted to the Court as part of the FTC's reply brief in support of its contempt motion.  *See* Doc. 368, at 4 (discussing the FTC's belated provision of the documents).  The e-mails were only

---

[2] To obtain these e-mails, the FTC sent a one-page letter to the Bureau of Prisons requesting "all e-mail communications between [Mr. Wheat] and any individual for the period March 1, 2010 through July 19, 2010." Doc. 332-6, at 79.

accessible on the Bureau of Prisons' "TRULINCS" system through its CorrLinks program, which had deleted the e-mails before the FTC informed Mr. Wheat's counsel it intended to use the e-mails and communications as part of the contempt proceedings. *See* Doc. 368, at 4; *see also* Doc. 365.

Through these communications, the FTC learned of a privileged memorandum sent by hard copy to Mr. Wheat while he was in prison. *See* Doc. 485-2, at 2–7 (PPT 117). The five-page memorandum was clearly marked "ATTORNEY/CLIENT AND WORK PRODUCT PRIVILEGE." *See id.* The FTC subpoenaed Hi-Tech's counsel to obtain a copy of the memorandum, and Hi-Tech moved to quash the subpoena. *See FTC v. Nat'l Urological Grp. Inc.*, No. 2:12-mc-02375 (N.D. Ala. Filed July 3, 2012). Ultimately, this Court denied the motion and required Hi-Tech's counsel to produce the memorandum. Doc. 433, at 4–8.

The Court rejected Mr. Wheat's efforts to keep these protected and privileged materials out of the contempt proceedings. *See* Doc. 365, at 3. It held that, by using the TRULINCS system, Mr. Wheat waived his privilege since the system "warns that communications with attorneys are not privileged." *Id.* at 1–3. But the TRULINCS system only warns that, by using the system, the prisoner consents to "monitoring." *See* Doc. 360-1, at 2 (FTC 55). The Court further held that, since Mr. Wheat had asserted a reliance-on-counsel defense, he had waived

his privilege with respect to any and all communications with his attorneys related to the subject matter of his defense, including over the hard-copy legal memorandum, *see* Doc. 433, at 8, even though the defense was asserted before Mr. Wheat had access to the e-mails in the FTC's possession.  *See* Doc. 368, at 4; Doc. 346, at 10 n.6.

On May 14, 2014, this Court issued the compensatory sanctions award as a final, monetary judgment for $40,000,950 against Hi-Tech, Mr. Wheat, and Mr. Smith, jointly and severally, and issued a monetary judgment against Dr. Terrill Mark Wright for $120,000.  Doc. 651.

### 5.     The Recall and Subsequent Incarceration of Mr. Wheat and Mr. Smith

The May 14, 2014, sanctions award also required the Contempt Defendants to conduct "a recall of Fastin, Lipodrene, Benzedrine, and Stimerex-ES with violative product packaging and labels from all retail outlets" and required the parties "to submit written reports to the court within 60 days of th[e] [May 14, 2014] order on the status of the product recall."  Doc. 650, at 28.  Importantly, the Court did not specify what form the recall should take, nor did it set a deadline for its completion.  *See id.*  Although Contempt Defendants immediately began a product recall upon receiving a June 23, 2014, Order clarifying the scope of the recall, the Court ordered a show-cause hearing to determine whether coercive contempt sanctions were needed to perfect a recall.  Doc. 694.  After a three-day

13

hearing, the court determined that the Contempt Defendants' previous recall efforts were insufficient even though the defense had tendered an expert witness who testified that the Defendants had performed a recall that met FDA standards – the Gold Standard for recalls – and ordered Mr. Wheat and Mr. Smith to be coercively incarcerated until they could satisfy four conditions: "(1) violative products are not available for purchase from retail stores, (2) a proper recall notice is in use, (3) the proper recall notice has been distributed to all retailers, distributors, and brokers associated with the products subject to the recall, (4) links to the recall notice are prominently displayed on each page of the company website."

Although the Defendants immediately undertook extensive efforts to comply with all four conditions of the Court's order, the Court summarily rejected the Defendants' initial motion to purge.   Mr. Wheat and Mr. Smith remained incarcerated until November 10, 2014, sixty-three days after the commencement of their incarceration, and were released only upon the FTC's agreement that the product recall had been completed.

## III.   THE COURT SHOULD RECUSE ITSELF BECAUSE ITS IMPARTIALITY MAY REASONABLY BE QUESTIONED UNDER 28 U.S.C. § 455(a).

"Any justice, judge or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."   28 U.S.C. § 455(a).   The United States Supreme Court has interpreted the standard for disqualification of District Court Judges as follows:

"Disqualification is *required* if an objective observer would entertain *reasonable* questions about the judge's impartiality.  If a judge's attitude or state of mind leads a detached observer to conclude that a fair and impartial hearing is unlikely, the judge must be disqualified."  *Liteky v. United States*, 510 U.S. 540, 564 (1994) (emphasis added).   Proof of partiality is not required, only the appearance of partiality.  *Liljeberg v. Health Services Acquisition Corp*., 486 U.S. 847, 865 (1988) (what matters is not the reality of bias or prejudice but its appearance).  In other words, so long as a judge's impartiality might reasonably be questioned, recusal is required "even though no actual partiality exists . . . because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible."  *Liljeberg*, 486 U.S. at 860. The purpose of Section 455 is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible. *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir. 1989) (quoting *Liljeberg*, 486 U.S. at 865). The standard for recusal under Section 455(a) is whether an "objective, disinterested lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *Kelly*, 888 F.2d at 744-45 (quoting *Parker v. Connors Steel Co*., 855 F.2d 1510 (11th Cir. 1988)); *accord In re Evergreen Sec., Ltd.*, 570 F.3d 1257, 1263 (11th Cir. 2009).

When Congress amended § 455(a), it made clear that judges should apply an objective standard in determining whether to disqualify themselves. A judge contemplating disqualification under § 455(a), then, should not ask whether he or she believes he or she is capable of impartially presiding over the case. Rather, the question is whether a judge's impartiality might be questioned from the perspective of a reasonable person, and every circuit has adopted some version of the "reasonable person" standard to answer this question. *See, e.g., United States v. DeTemple*, 162 F.3d 279, 286 (4th Cir. 1998), *cert. denied*, 119 S. Ct. 1793 (1999); *In re Hatcher*, 150 F.3d 631, 637 (7th Cir. 1998); *Baldwin Hardware Corp. v. Franksu Enter. Corp.*, 78 F.3d 550, 557 (Fed. Cir. 1996); *Blanche Rd. Corp. v. Bensalem Twp.*, 57 F.3d 253, 266 (3d Cir. 1995); *United States v. Lovaglia*, 954 F.2d 811, 815 (2d Cir. 1992); *Vieux Carre Prop. Owners v. Brown*, 948 F.2d 1436, 1448 (5th Cir. 1991); *In re Barry*, 946 F.2d 913, 914 (D.C. Cir. 1991); *United States v. Nelson*, 922 F.2d 311, 319 (6th Cir. 1990); *Little Rock Sch. Dist. v. Arkansas*, 902 F.2d 1289, 1290 (8th Cir. 1990); *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988); *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987); *United States v. Studley*, 783 F.2d 934, 939 (9th Cir. 1986); *In re United States*, 666 F.2d 690, 695 (1st Cir. 1981). What matters is not actual bias, but an *appearance* of such. *Liteky*, 510 U.S. at 548. It is enough that the average

layperson would have doubts about any judge's impartiality under the circumstances. *Kelly*, 888 F.2d at 745.

Because of its "fact-driven" nature, analysis "must be guided, not by comparison to similar situations addressed by prior jurisprudence, but rather by an independent examination of the unique facts and circumstances of the particular claim at issue." *United States v. Holland*, 519 F.3d 909, 913 (9th Cir. 2008). In performing this analysis, the court "must bear in mind that . . . outside observers are less inclined to credit judges' impartiality and mental discipline than the judiciary itself will be." *Id.* at 912, 914. The Eleventh Circuit, as well as the Fifth, Sixth, and Tenth, has said that close questions should be decided in favor of disqualification. *See United States v. Kelly,* 888 F.2d 732, 744 (11th Cir. 1989); *Republic of Pan. v. Am. Tobacco Co.,* 217 F.3d 343, 347 (5th Cir. 2000) (citing *In re Chevron,* 121 F.3d 163, 165 (5th Cir. 1997)); *Nichols v. Alley,* 71 F.3d 347, 352 (10th Cir. 1995); *United States v. Dandy,* 998 F.2d 1344, 1349 (6th Cir. 1993).

In the case at bar, the Court's role as fact finder militates in favor of recusal. For example, in *Alexander v. Primerica Holdings, Inc.,* 10 F.3d 155 (3d Cir. 1993), the Third Circuit said: "We cannot overlook the fact that this is a non-jury case, and that [the judge] will be deciding each and every substantive issue at trial . . . . When the judge is the actual trier of fact, the need to preserve the appearance of impartiality is especially pronounced." *Id.* at 163, 166. The justification for

making perceived partiality a grounds for disqualification is at least twofold. First, regardless of whether judges are partial in fact, public perceptions of partiality can undermine confidence in the courts. Second, disqualifying judges for outward manifestations of what could reasonably be construed as bias obviates making subjective judgment calls about what is actually going on inside a judge's heart and mind.

If this Court fails to apply the requisite objective standard and recuse itself it would turn the true intent of § 455(a) on its head. As Circuit Judge Fay wrote in *Potashnick v. Port City Construction Company,* 609 F.2d 1101 (5th Cir. 1980):

> This overriding concern with appearances, which also pervades the Code of Judicial Conduct and the ABA Code of Professional Responsibility, stems from the recognized need for an unimpeachable judicial system in which the public has unwavering confidence…. Because 28 U.S.C. § 455(a) focuses on the appearance of impartiality, as opposed to the existence in fact of any bias or prejudice, a judge faced with a potential ground for disqualification ought to consider how his participation in a given case looks to the average person on the street. Use of the word "might" in the statute was intended to indicate that disqualification should follow if the reasonable man, were he to know all the circumstances, would harbor doubts about the judge's impartiality.

*Id.* at 1111.

The legislative history indicates that Section 455(a) was meant to lessen the traditional "duty to sit," and, as the Supreme Court has indicated, to require

avoidance of even the appearance of partiality. *Liljeberg v. Health Serv. Acquisition Corp.*, 486 U.S. 847, 860-61 (1988). Recusal may be required even in the absence of actual partiality if there is an objectively reasonable basis for doubting the judge's impartiality. *Id.*; see Code of Conduct for United State Judges, Comment to Canon 2 ("[A] judge should avoid impropriety and *the appearance of impropriety*.") (emphasis supplied). Weighing all the factors in the present case, a reasonable person viewing all the circumstances would question the impartiality of the Court. When a judge harbors any doubts concerning whether disqualification is required, he should resolve the doubt in favor of disqualification. *Parker*, 855 F.2d at 1524.

**A. The Course of This Court's Actions During the Proceedings Leads to the Appearance of Partiality**

A fully informed, disinterested layperson, in view of all of the facts of the Court's conduct set forth above, may have significant doubts about this Court's partiality. The facts weigh heavily in favor of this Court's disqualification from this matter.

In 2011, this Court required that the Contempt Defendants present scientific evidence that far exceeded the express requirements of the 2008 Injunction. When the Contempt Defendants attempted in good faith to present expert testimony about the applicable scientific standards that should be used when evaluating marketing claims of nutritional supplements, the Court not only disregarded, but altogether

19

refused to consider, such testimony. The Court supported its conclusions by applying the doctrine of collateral estoppel, and applied a significantly stricter scientific standard than was required by the 2008 Injunction. The Contempt Defendants were severely prejudiced by this decision, and it must be noted that the Court's decision was vacated by the Eleventh Circuit. *See* Doc. 815 (holding that the Court misapplied the doctrine of collateral estoppel, the appellate court remanded to this Court for further proceedings, in which the Contempt Defendants could present their expert testimony.)

On May 11, 2012, the Court issued an order in which it held that the Contempt Defendants could rely only on a randomized, double-blind, placebo-controlled clinical trial of a product or an exact duplicate thereof when making weight loss claims about that product.  Doc. No. 390 at 8.  On August 7, 2012, the Court denied Contempt Defendants' Motion for Reconsideration, Doc. 396, holding, among other things, that Contempt Defendants were precluded from using any definition of "competent and reliable scientific evidence" for purposes of the contempt proceeding other than that to which Dr. Aronne testified.  Doc. 422 at 17. The Court's holdings that Contempt Defendants were precluded from using any standard of "competent and reliable scientific evidence," other than double-blind, placebo-controlled clinical trials, imposed a condition that was not within the four corners of the original Injunction.

The Defense strenuously argued for an interlocutory appeal on this issue because it would have materially advanced the termination of this litigation. In fact, the Defendants stated, "[i]f the Court's holding that Contempt Defendants are limited to using double-blind, placebo-controlled clinical trials to support its advertising claims prevails on appeal, then the primary questions remaining are whether Defendants acted in good faith and whether sanctions are appropriate. On the other hand, if the Court of Appeals reverses the Court, determining sanctions may never be required." Doc. 425, at 5. Simply put, this was not a case where the same issues would remain regardless of how the Court ruled. *See McFarlin v. Conseco Services, LLC,* 381 F.3d 1251, 1259 (11th Cir. 2004) (citing cases). To the contrary, waiting for the Court of Appeals to make that decision one way or the other has only prolonged the litigation. Ironically, now that the Eleventh Circuit has vacated the Court's decision and remanded, the entire discovery and hearing process must begin again. If the Court had permitted an interlocutory appeal to go forward, the Eleventh Circuit would have reversed, and Mr. Wheat and Mr. Smith would not have needlessly spent over two months in jail for contempt of court. Hi-Tech also would not have suffered lost sales, irreparable harm to its reputation, and would not have lost millions in conducting unnecessary recalls nor the market share it lost by having to conduct – not one but two – unnecessary recalls.

The Court's actions in its determination of sanctions as set forth above would lead a lay observer to doubt its impartiality.  Additionally, in its January 2014 hearing examination of Mr. Wheat, the Court personally and inappropriately asked an extensive line of questions entirely unrelated to the sanctions matter at hand.  Moreover, the Court took the extraordinary step of incarcerating Mr. Wheat and Mr. Smith for contempt for not completing a product recall while Mr. Wheat and Mr. Smith, who were essential to the day-to-day operations of Hi-Tech and the implementation of the recall, were in the process of complying fully with the requirements of the recall.  Further, upon ordering incarceration, the Court added additional, new conditions with which the Contempt Defendants were expected to comply *from their prison cells*.

The Court's actions do not need to prove partiality; indeed, it is sufficient to show the appearance of bias.  The weight of all of the facts could easily lead any reasonable observer to have significant doubts about the Court's partiality in this matter.  Therefore, respectfully, the Defendants move for the Honorable Charles A. Pannell, Jr. to recuse himself pursuant to 28 U.S.C. § 455(a) and to disqualify himself from any further proceedings in connection with this matter.

**B. This Court Has Reviewed and Relied on Privileged Communications**

The facts of this case plainly would lead a reasonable person to conclude the Court's impartiality might reasonably be questioned.  The Court has reviewed

privileged communications between Jared Wheat and his attorneys, including a confidential memorandum laying out Contempt Defendants' legal strategy. Rather than disregard, or refuse to review privileged and confidential information, the Court specifically reviewed, considered and referenced these documents in rendering its decision on the FTC's motion to hold Contempt Defendants in contempt. The fact that the Court considered such evidence, and relied on it in reaching its earlier decision on the FTC's motion to hold Defendants in contempt, calls into question whether the Court can purge that information from its consciousness. Now that the Eleventh Circuit has ruled that the Contempt Defendants may present a defense based on scientific evidence, they should be allowed to proceed before a judge untainted by having seen privileged information.

In short, the Court has reviewed, considered and expressed an opinion on privileged material involving sensitive content. Respectfully, this establishes at the very least the ***appearance*** of bias – even if there is no actual bias – and underscores the need for disqualification.

## CONCLUSION

Accordingly, Defendants respectfully move the Honorable Charles A. Pannell, Jr., to recuse himself pursuant to 28 U.S.C. § 455(a) and to disqualify himself from any further proceedings in connection with this matter.

Respectfully submitted,

*/s/ E. Vaughn Dunnigan*
E. VAUGHN DUNNIGAN, P.C.
2897 N. Druid Hills Rd., Suite 142
Atlanta, Georgia 30329
(404) 663-4291
evdunnigan@hotmail.com
Georgia Bar No. 234350


*/s/ Arthur W. Leach*
5780 Windward Parkway, Suite 225
Alpharetta, Georgia 30005
(404) 786-6443
art@arthurleach.com
Georgia Bar No. 442025

*/s/ Jack Wenik*
EPSTEIN BECKER & GREEN, P.C.
One Gateway Center
Newark, New Jersey 07102
(973) 639-5221
Email: jwenik@ebglaw.com
Admitted Pro Hac Vice

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1(D)

Pursuant to Local Rules 5.1(C) and 7.1(D), I hereby certify that this motion was prepared in Microsoft Word using 14-point Times New Roman font.

## CERTIFICATE OF SERVICE

I hereby certify that the above document, together with the memorandum of law in support thereof, and the corresponding proposed order, were electronically filed using the CM/ECF system and were served upon counsel of record via electronic mail on this the 23rd day of August, 2015.

*s/ E. Vaughn Dunnigan*
Georgia Bar No. 234350
E. Vaughn Dunnigan, P.C.
2897 N. Druid Hills Road, Suite 142
Atlanta, GA  30329
Telephone: (404) 663-4291
Email: evdunnigan@hotmail.com